# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## 9:19-CV-80001-RLR

JOSEPH K. RENSIN,　　　　　　　　　　　　Bankruptcy Case No:
　　　　　　　　　　　　　　　　　　　　　17-01185-EPK
　　　Appellant,

v.

FEDERAL TRADE COMMISSION,

　　　Appellee.
_____/

## ORDER AFFIRMING BANKRUPTCY COURT DECISION

This matter is before the Court upon the appeal by Appellant Joseph K. Rensin of the Bankruptcy Court's final judgment in favor of the Appellee. The Court has carefully considered the appeal, the briefs, and the record on appeal, and is otherwise fully advised in the premises.

## I.　　BACKGROUND

Appellant is the founder of a company known as "BlueHippo." ER-123.[1] BlueHippo was a company focused on marketing computers to consumers with poor credit. ER-101-06. In 2008, the Federal Trade Commission ("FTC"), the Appellee, sued BlueHippo because of alleged deceptive practices. ER-162-78. BlueHippo did not contest the charges and instead agreed to a consent order that required it to cease unlawful practices. ER-001-96. Under the consent order, BlueHippo and its officers (including Appellant) were required to disclose to consumers "all material terms and conditions of any refund, cancellation, exchange, or repurchase policy." ER-120.

---

[1] Because of the convenience of the organization and pagination of the record on appeal provided by Appellee, the Court's "ER" citations are to the excerpted record citations attached to Appellee's brief.

BlueHippo's refund policy is at the core of this appeal. BlueHippo required customers to make a certain number of monthly payments before the customer could receive a computer. If the customer cancelled the payment plan or missed a payment, the customer would not receive a computer, but could instead spend the money they had previously paid as a credit on BlueHippo's online store. *See* ER-120. What the customer was not informed of was that any purchase from the online store would require the customer to pay additional money for shipping, handling, and taxes. *Id.* Additionally, the customer could only purchase one item at a time, which had the effect of maximizing shipping costs (these terms are subsequently referred to as the "Extra Terms"). *See id.* The Extra Terms were effective insofar as approximately 55,000 consumers paid over fourteen million dollars to BlueHippo and never received any merchandise in return (including merchandise from the online store via credit). ER-138.

After Appellant entered into the consent order with the FTC, customers were not notified of the Extra Terms. This led to the FTC initiating contempt proceedings in the Southern District of New York. ER-119. The district court found that the consent order had been violated by BlueHippo and also found that Appellant was liable for that violation. ER-104-08. The district court entered a judgment against Appellant and Appellant filed for bankruptcy protection. In the bankruptcy proceeding, the FTC sought to have Appellant's debt declared non-dischargeable. After a trial, the Bankruptcy Court granted that relief. The dischargeability of Appellant's debt is the issue on appeal to this Court.

## II. STANDARD OF REVIEW

Under Federal Rule of Bankruptcy Procedure 8013, a district court reviews the factual findings of a bankruptcy court for clear error. As for conclusions of law and application of law to

the facts of a case, a district court conducts a *de novo* review. *In re Feingold*, 730 F.3d 1268, 1272 n.2 (11th Cir. 2013).

### III. DISCUSSION

The Bankruptcy Court found that Appellant's debt was a non-dischargeable debt. Appellant's arguments that this decision was in error are best divided into two groups: (1) the Bankruptcy Court erred by imposing derivative liability on Appellant and (2) the Bankruptcy Court's factual findings have no supporting evidence. Each argument is addressed in turn.

**(1) The Derivative or Non-Derivative Nature of Appellant's Liability**

Appellant's first argument is that the Bankruptcy Court erred when it determined that Appellant's debt was non-dischargeable because of the bad acts of BlueHippo and the bad acts of other workers at BlueHippo—that Appellant's liability was non-dischargeable because of Appellant's status as the CEO of BlueHippo. Appellant's position is belied by the text of the Bankruptcy Court's decision. The Bankruptcy Court did not find Appellant to be derivatively liable; the Bankruptcy Court found Appellant to be *directly* liable because of his own actions.

The Bankruptcy Court's decision on the dischargeablility of Appellant's debt rested on two provisions of the Bankruptcy Code: 11 U.S.C. section 523(a)(2)(A) and section (a)(6). These two provisions were enacted to ensure that the Code's protections are reserved for "honest but unfortunate debtor[s]" and are not abused to shelter wrongdoing. *See Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998); *St. Laurent v. Ambrose*, 991 F.2d 672, 680 (11th Cir. 1993) ("The general policy that exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor likewise applies to honest debtors only."). For these sections to render a debt non-dischargeable a bankruptcy court must find, *inter alia*, that the debtor made false

3

representations (with an intent to deceive) and that the debtor's conduct was willful. *E.g., In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998); *In re Walker*, 48 F.3d 1161, 1165 (11th Cir. 1995). Debtors rarely admit to having bad intent or knowledge of falsity; thus, in applying the foregoing sections, the Bankruptcy Court "may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer . . . intent to deceive." *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994).

Here, the issue before the Bankruptcy Court was the Extra Terms pertaining to the store credit refund policy. The Bankruptcy Court found that Appellant directly and personally participated in the creation of the Extra Terms, that he knew of those terms from their inception, and that he knew those terms were not being communicated to customers. ER-230-32, 236. The Bankruptcy Court's finding of Appellant's direct, personal involvement was clear: the Bankruptcy Court found that Appellant "was at the helm of and guided Blue Hippo in its every action in connection with [the] fraud." ER-236. Similarly, the Bankruptcy Court found Appellant's participation was "personal" and that he acted with "full knowledge" with "intent to deceive." ER-230, 236.

Because the Bankruptcy Court's decision plainly found that Appellant directly participated in the relevant bad acts, Appellant's argument to the contrary is partially based upon a procedural quirk—a quirk of Appellant's own making. In the underlying district court proceedings (wherein Appellant's liability arose), Appellant stipulated to his own liability; Appellant stipulated that if his company was liable for contempt then he was as well. ER-119. Thus, the district court had no need to make a finding of intent as to Appellant *personally*. Instead, the district court imposed liability on Appellant because it found his company was liable. As a result, Appellant now argues

4

that the district court determined that Appellant was only derivatively liable—not personally liable. But the district court's decision was drafted and structured in light of *Appellant's stipulation*.[2] The district court made no finding as to Appellant's state of mind. This is precisely why the Bankruptcy Court determined that a trial was needed on the issue—a trial to determine, in the first instance, Appellant's state of mind. This is also why the Bankruptcy Court possesses the power to "look behind" a stipulation or judgment to determine the "true nature of the debt" for dischargeability purposes. *See Archer v. Warner*, 538 U.S. 314, 320-22 (2003). The Bankruptcy Court properly exercised its power to determine the true nature of Appellant's debt when it held a trial on Appellant's state of mind.

In summary, the Bankruptcy Court did not impute liability on Appellant or impute the bad acts of others on Appellant—it made findings as to Appellant's personal, direct actions.[3] The Bankruptcy Court's decision was necessitated because of Appellant's prior stipulation to the district court. For the foregoing reasons, each of Appellants' arguments that the Bankruptcy Court improperly imposed derivative liability is rejected.

**(2) The Bankruptcy Court's Factual Findings**

Appellant next challenges the Bankruptcy Court's factual findings of his direct participation in the relevant bad acts. Appellant argues that the Bankruptcy Court had no competent or substantial evidence to support its factual findings. The essence of Appellant's argument is that because he was the only witness at trial on this issue and because no other witness

---

[2] The Court also acknowledges and credits Appellee's observation that if Appellant's argument had merit, then a corporate officer who stipulates to responsibility for a judgment could automatically avoid personal responsibility in subsequent bankruptcy proceedings.

[3] Moreover, it is not necessary for a for a debtor to personally engage in the fraudulent conduct; instead it is sufficient when, as here, the debtor directly participated in the fraudulent conduct. *E.g., FTC v. Lanier*, 589 B.R. 901, 909 (Bankr. M.D. Fla. 2017). What *is* required is that the "basis of the debt be 'obtained by' the requisite fraudulent conduct." *Id.*

was called to dispute his testimony that he acted in good faith, the Bankruptcy Court had no choice but to find that Appellant acted in good faith. Appellant's position ignores the the additional evidence that was introduced at trial.

Appellant testified on prior occasions at depositions. That testimony was admitted at trial and that testimony conflicted with Appellant's trial testimony. ER-265, 267. The Bankruptcy Court found that Appellant's trial testimony lacked credibility, and that Appellant's earlier deposition testimony had greater credibility. ER-233, 236. The Bankruptcy Court gave a detailed explanation of its credibility findings:

> In light of his changing testimony over time, and the greater weight of the evidence to the contrary, the Court does not find credible Mr. Rensin's testimony that he did not know during the relevant period of the implementation of the store credit refund policy and the failure to disclose the extra terms to customers, but only learned of these matters long after.
>
> Mr. Rensin was the founder, CEO, and chairman of the board of BlueHippo from its inception until he left the company in July 2009. Mr. Rensin was also the sole owner of BlueHippo and the staffing entity that provided all of BlueHippo's employees. Mr. Rensin personally hired BlueHippo's department heads and they reported directly to him. Every employee of BlueHippo ultimately reported to Mr. Rensin. Mr. Rensin met regularly with the company's chief operating officer, who was responsible for advertising, marketing, and the telemarketing scripts. Mr. Rensin had weekly meetings with the chief operating officer, the telemarketers, and the marketing personnel. Mr. Rensin also had regular meetings with employees in charge of advertising, to oversee the effectiveness of BlueHippo's ads.
>
> Mr. Rensin reviewed BlueHippo's ads and telemarketing scripts and gave input on them. In addition to weekly meetings, Mr. Rensin had regular contact with BlueHippo's telemarketers, who worked on the other side of a wall from his office. Mr. Rensin regularly walked through the telemarketing area and overheard telemarketers reading from scripts as they interacted with customers. Given his overarching management control of BlueHippo, which was in effect Mr. Rensin's company, the Court did not find credible Mr. Rensin's testimony that when he walked through the telemarketing area he failed to interact in any way with his own employees or otherwise take note of what was happening as he passed through.

> Mr. Rensin contends that he did not know of the extra terms of BlueHippo's store credit policy until after the relevant period. The Court did not find this testimony credible. Based on the greater weight of the evidence in this adversary proceeding, including Mr. Rensin's own prior testimony, his complete control over BlueHippo, his detailed involvement in its day to day affairs including its marketing to customers, and his knowledge of the finances of the company, there is no doubt that Mr. Rensin not only knew of the extra terms but specifically authorized their implementation in order to ensure the substantial net revenue BlueHippo actually obtained as a result of the extra terms.
>
> Mr. Rensin was involved in the decision to implement each of BlueHippo's refund policies. Mr. Rensin previously testified that he was one of the people involved in creating the store credit refund policy. Shortly after the relevant time period, in 2009, Mr. Rensin testified concerning the extra terms including that they were created in response to a class action against BlueHippo. Mr. Rensin's testimony at that time, taking into account the manner in which he answered questions, is not consistent with Mr. Rensin having learned of the extra terms only after his departure from the company. In other words, it is apparent that Mr. Rensin was testifying from knowledge he had during the relevant period rather than from knowledge he gained after the relevant period but prior to his testimony. In addition, in a separate sworn statement, Mr. Rensin stated, based on his personal knowledge, that the extra terms had been in place since BlueHippo created the online store. If Mr. Rensin learned of the extra terms only after the fact, he could not personally know that the extra terms were always part of the store credit return policy.
>
> Mr. Rensin's trial testimony that he did not learn of the extra terms until after the relevant period is also inconsistent with a position he took in this very litigation. Mr. Rensin earlier argued that he had obtained advice of counsel relating to the extra terms during the relevant period. In order to present that defense, Mr. Rensin would need to show that he had disclosed all material facts to his attorney and that he had relied in good faith on the attorney's advice. *United States v. Petrie*, 302 F.3d 1280, 1287 (11th Cir. 2002). This would require Mr. Rensin to show that he advised the relevant lawyer or lawyers of the extra terms as well as when they were disclosed to customers. But if Mr. Rensin did not know about the extra terms during the relevant period, he could not have provided counsel with that information. After discovery by the plaintiff revealed that none of the counsel advising BlueHippo during the relevant time remembered providing advice on this issue, Mr. Rensin changed his position, claiming that he did not know of the extra terms during the relevant period. Indeed, Mr. Rensin conceded at trial in this matter that he never sought advice of counsel with regard to the extra terms.

ER-230-33. Crediting Appellant's earlier testimony, the Bankruptcy Court noted Appellant's prior admission that his company targeted "customers [with] poor credit histories," and that it targeted

7

"consumers who could neither pay the full purchase price [of a computer] in a lump sum nor qualify for credit." ER-288-89. Finding that Appellant personally participated in the creation of the Extra Terms and refund policies, the Bankruptcy Court summarized the crux of Appellant's actions:

> [If the customers] sent money to a company that they can only get the value of by sending *more* money to the company, it seems to me that's a built-in deterrent for them to be able to get the money back . . . it seems like *it's designed* to permit the company to retain 14 million dollars . . . *for nothing*.

ER-160-61 (emphases added). The Bankruptcy Court also made a finding as to Appellant's motive to deceive customers—the extreme pressure to generate revenues without corresponding increases in expenses because of on-going legal battles with various agencies. ER-228. And evidence was introduced that Appellant told his attorneys he did not want to cooperate with the FTC in connection with the consent order. *See* ER-132.

In conclusion, the Bankruptcy Court's decision not to credit Appellant's trial testimony is entitled to substantial deference because "a determination concerning fraudulent intent depends largely upon an assessment of the credibility of the demeanor of the debtor, [and] deference to the bankruptcy court factual findings is particularly appropriate." *In re Miller*, 39 F.3d at 304-05. There is a plethora of authority that stands for the proposition that the Bankruptcy Court is permitted to disbelieve the trial testimony of a debtor as an "after-the-fact attempt to explain away" bad facts particularly when, as here, trial testimony conflicts with prior testimony. *See In re Kane*, 755 F.3d 1285, 1295 (11th Cir. 2014). The Bankruptcy Court's inference—that Appellant was personally involved in the relevant bad acts—was a permissible one. This Court reviews factual findings for clear error. *In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996). If the Bankruptcy Court's assessment of the evidence is plausible in light of the entire record, this Court may not

reverse, even if it may have weighed the evidence differently. *In re Kane*, 485 B.R. at 468. The Bankruptcy Court's factual findings are plausible in light of the entire record, and this Court will not disturb those findings. As a result, all of Appellant's challenges to the Bankruptcy Court's factual findings are rejected.[4]

Having rejected all of Appellant's arguments on appeal, the decision of the bankruptcy court is therefore **AFFIRMED**. The Clerk of the Court shall **CLOSE THIS CASE**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 25th day of July, 2019.

Copies furnished to Counsel of Record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

---

[4] Appellant's remaining arguments are rejected without comment.